## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Sioux Steel Company, | |
| Plaintiff, | |
| | Case No. 16-cv-2212 |
| v. | |
| | Judge Mary M. Rowland |
| Prairie Land Mill Wright Services and Duane Chaon, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

The case comes before this Court on the parties' pre-trial motions to exclude experts pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Court rules as follows below.

## LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert* govern the admissibility of expert testimony. Expert testimony is admissible under Rule 702 if technical or specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue." District courts act as gatekeepers and must ensure that expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (internal quotation marks omitted). Relevant factors in this determination include testing, peer review, error rates, and acceptance by the relevant expert community. *See Daubert*, 509 U.S. at 593–94. The reliability

1

inquiry is flexible, however, and not all of these factors will apply in every case. *See Kumho*, 526 U.S. at 141.

In assessing the admissibility of expert opinions, courts do not focus on "the ultimate correctness of the expert's conclusions," *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013), but "solely on principles and methodology," *Daubert*, 509 U.S. at 595. The "soundness of the factual underpinnings" and "correctness of the expert's conclusions" may affect any ultimate determination on the merits, but do not govern admissibility. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718–19 (7th Cir. 2000). The expert must explain his or her methodology and cannot "simply assert a bottom line." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Finally, the expert "may be qualified by knowledge, skill, experience, training, or education." *See Smith*, 215 F.3d at 718 (internal quotation marks omitted). District courts have "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009).

## ANALYSIS[1]

### I.    Jeffrey Decker

Defendants move to exclude Plaintiff's infringement and damages expert, Jeffrey Decker. [414].

---

[1] This Court presumes familiarity with the facts of this case, as set forth in detail in this Court's summary judgment opinion.

Decker is the President and Owner of Decker Consulting and Investigations Inc. [416-1] at 2. He has over thirty years of experience in the agriculture industry, including in the grain storage and handling industry. *Id.*; [416-5] at 5–6. He graduated from Eastern Illinois University with a bachelor of science degree in industrial technology with a concentration in construction. [416-1] at 2. He is the member of various professional affiliations, including the Grain Handling Safety Coalition. *Id.* at 4. Decker has designed and developed various pieces of farm equipment; among them, he also patented the Peanut TopDry Drying System. *Id.* As part of his business, Decker provides consulting services for, among other things, grain entrapment/engulfment prevention and rescue. [416-5] at 6. Defendants move to exclude Dr. Decker's opinions in their entirety based on his purported lack of qualifications and his damages opinions as unreliable.

### A. Qualifications

First, they argue that Decker is not qualified to testify in this case. In patent cases, a "witness may testify as a technical expert on issues such as noninfringement and invalidity only if 'the witness is qualified as an expert in the pertinent art.'" *Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501, 508 (D. Del. 2017) (quoting *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008)). Decker's declaration described a person of ordinary skill in the art as someone "having a B.S. degree in engineer, or equivalent, with several years of experience in the design and operation of commercial grain handling, including grain bins and reclaim equipment." [416-5] at 22. Decker continues that an "engineering degree is

not necessary and could be substituted by several additional years of experience in the design and operation of commercial grain handling equipment." *Id.* Defendants do not disagree with Decker's characterization of a person possessing ordinary skill in the art. Rather, they argue that Decker does not meet his own definition because he does not hold an engineering degree, does not possess design experience, and his CV does not mention "grain bin sweeps." [415] at 2–3.

Decker is sufficiently qualified to testify as a person possessing ordinary skill in the relevant art. Although he does not possess an engineering degree, by his definition of one possessing skill in the ordinary art, the lack of engineering degree can be supplanted by years of experience with commercial grain handling equipment. Decker meets that definition because he holds a degree in industrial technology, has had over thirty years of experience consulting in the agriculture industry, and, according to his declaration, has many years of experience in designing and operating grain handling equipment, including grain bins and grain reclaim equipment. [416-2] at 3. Defendants complain that Decker does not possess specialized knowledge in paddle sweeps (a component of a grain storage structure), but that argument "draws the scope of the pertinent art too narrowly." *Sonos*, 297 F. Supp. 3d at 509. Decker's lack of specialized knowledge in paddle sweeps can be explored during cross-examination.

### B.     Damages Opinions

Defendants next move to exclude Decker's damages opinions on the basis that Decker lacks a verifiable methodology. Patent laws allow two categories of

4

compensation for infringement: the patentee's lost profits and the reasonable royalty the patentee would have received through arms-length bargaining. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed Cir. 2009).

Defendants here focus on Decker's lost profits opinions. To recover lost profits in a patent case, the fact-finder must determine "what would the patent holder have made (what would his profits have been) if the infringer had not infringed." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017). A patentee can recover lost profit damages if it can establish four things: (1) demand for the patented product; (2) the absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made." *Id.* Relevant here, the second factor—"absence of non-infringing alternatives"—considers demand for particular limitations or features of the invention. *Id.* If "there is a non-infringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale." *Id.* at 1286. The determination "is made on a customer-by-customer basis." *Id.*

In his expert report, Decker opines:

> I understand that the Defendants contend that auger sweeps, the Sukup paddle sweep, an Illinois Grain and Seed sweep, a Hutchinson auger with add-on paddle sweep, a Skandia Elevator sweep, a Boubiela Moret sweep, the GSI Balloon Bladder System, funnel systems, and vacuum systems are acceptable non-infringing alternatives to the claimed technology in the Asserted Patent and Sioux Steel's Commercial Embodiments. I disagree with the Defendants for the following reasons.

[416-5] at 48. Decker then walks through why he believes each of these products do not constitute non-infringing alternatives. For instance, he opines that the auger sweep is not an acceptable alternative because it contains a helical blade instead of paddles to move the grain. [416-5] at 49. Those helical blades, Decker opines, become clogged and individuals can, and have, suffered injuries from the spinning blade, while, in contrast, paddle sweeps like the one in the Patent pose no such risks. *Id.*

Defendants fault Decker with relying on customer conversations and input in coming to his opinions that no customers would find auger sweeps, other paddles sweeps, or other grain removal products to be acceptable alternatives. [415] at 7–9. Defendants criticize Decker's reliance on these conversations as "undisclosed hearsay." *Id.* But information "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" need not be admissible in order for the court to admit the opinion testimony, Fed. R. Evid. 703; *see United States v. Brownlee*, 744 F.3d 479, 481–82 (7th Cir. 2014) (noting that "an expert witness is permitted to rely on any evidence, whether it would be admissible or inadmissible if offered by a lay witness, that experts in the witness's area of expertise customarily rely on").

Defendants also argue that Decker lacks a methodology for analyzing acceptable non-infringing substitutes. [415] at 6–15. Although lengthy, Defendants' argument boils down to the notion that Decker failed to apply a customer-by-customer analysis regarding the non-infringing alternatives and did not conduct any consumer or market surveys, rather relying on his own "general knowledge" and

6

unspecified conversations with consumers as the basis for his opinions. *Id.* There is, however, no set methodology for establishing lost profit damages. *See Numatics, Inc. v. Balluff, Inc.*, 66 F. Supp. 3d 934, 952 (E.D. Mich. 2014) (rejecting argument that an expert failed to "apply a customer-by-customer analysis or market-share approach" in his lost profits analysis). It is sufficient that Decker considered the possible non-infringing alternatives Defendants offered and concluded that none "had the advantages" of Plaintiff's patented products based on his general knowledge of the industry and his conversations with consumers. *Id.*; *see also, e.g.*, *Emerson Elec. Co. v. Suzhou Cleva Elec. Appliance Co.*, No. 4:13CV1043SPM, 2015 WL 8916113, at *9 (E.D. Mo. Dec. 15, 2015) (admitting defense expert's opinions about non-infringing alternatives which were based upon conversations with defendant's president about the defendant's "capacity to substitute noninfringing products for infringing products"); *AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411 (GHW)(SN), 2019 WL 1254763, at *20 (S.D.N.Y. Mar. 19, 2019) (finding expert testimony on non-infringing alternatives sufficiently reliable where the expert testified "based on his decades of experience in the outdoor apparel industry" that "three zippers . . . are in fact used by brands as a possible substitute to the allegedly infringing zippers"); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1013 (N.D. Cal. 2013) (holding that "the fact Mr. Byrd relied on his own expertise to assess the cost and time required to implement the alternative, as opposed to retrieving data from Sony, does not render Mr. Byrd's methodology unreliable"). Thus, Decker's analysis of non-infringing alternatives is sufficiently reliable to be admissible. The concerns Defendants raise

7

regarding the bases for his opinion go to the weight of his opinion and not its admissibility.

For the foregoing reasons, Defendants' motion to exclude Jeffrey Decker [414] is **DENIED**.

## II.    Bruce Meyer

Plaintiff moves to exclude the opinions of Defendants' infringement expert, Bruce Meyer. [409]. Meyer has over fifty years of experience in grain handling on farms, including the use of various types of grain sweeps and over thirty-years of experience on automation of various types of agricultural equipment. [411-1] at 4. He holds a bachelor of science in electronic engineering. *Id.*

### A.    Qualifications

Plaintiff argues that Meyer is unqualified to testify as a person with ordinary skill in the pertinent art because his education and experience is too generalized and unrelated. [411] at 7–8. Plaintiff points specifically to Meyer's lack of experience with mechanical or structural aspects of sweeps, and with design, repair, or fabrication of grain bin sweeps. *Id.* As Plaintiff argues, Meyer's experience with grain sweeps is working with the electronic, rather than mechanical, components of such machines. *Id.* at 3–4.

This Court finds Meyer sufficiently qualified to opine on infringement. Although he is not experienced with the design of grain bin sweeps, he holds a degree in engineering and his "technical background is sufficiently related to that pertinent art"—here, the design of a grain bin sweep. *Sport Dimension, Inc. v. Coleman Co.,*

8

*Inc.*, No. CV1400438BROMRWX, 2015 WL 12732710, at *5 (C.D. Cal. Jan. 29, 2015), *aff'd*, 820 F.3d 1316 (Fed. Cir. 2016). Any lack of experience Meyer has with the design of grain sweeps can properly be addressed through cross-examination. *See, e.g.*, *Evans v. John Crane, Inc.*, No. CV 15-681 (MN), 2019 WL 5457101, at *8 (D. Del. Oct. 24, 2019) (explaining that an expert's inexperience in a particularized area goes to the weight, not the admissibility, of his or her opinion).

### B.  Non-Infringement Opinions

Next, Plaintiff contends that Meyer's opinions should be excluded because they are conclusory and because some of them conflict with other facts contained in the record. [411] at 9–10, 13–14. Upon review of Meyer's report, the Court concludes that Meyer's report is sufficient. On literal infringement, Meyer compares the limitations in claim 1 of the Patent and explains his opinions that Prairie Land's Accused Products lack certain limitations. [411-1] at 12–16. Under the doctrine of equivalents, Meyer describes how the Accused Products do not perform in substantially the same way as the sweep described in the Asserted Patent. [411-1] at 14, 15, 16. Plaintiff argues that Meyer provides "nothing to support his statements—not even a drawing, illustration, or photograph" of the Accused Products. [411] at 10. But they cite no authority requiring such specificity. Their disagreement with Meyer's opinions, or with the factual bases underlying them, are more properly addressed through cross-examination.

Plaintiff also argues that Meyer impermissibly opines that the "pivot unit" and "drive unit" of the Accused Products are not "configured to" support the weight of the

paddles. [411] at 10–11.[2] Meyer opines that Prairie Land's pivot unit and drive unit are not configured to carry the weight of the paddles because they are not designed to "accomplish the objective of supporting the weight of the paddles, which simply travel through the pivot and drive units with their chain unsupported by a sprocket or the like." [411-1] at 13. With respect to Prairie Land's Bin Gator sweep, Meyer elaborates that the sweep's return area floor is not "configured to" to support the weight of the paddles because they are not "specially designed" to do so. *Id.* Plaintiff argues that Meyer's opinion imposes a requirement of subjective intent that is based on an erroneous construction of "configured to." [410] at 10–11. But this Court explained in its summary judgment opinion that, consistent with Meyer's opinion, "configured to carry" requires a particular intent or objective of the inventor—that is, the phrase is "most naturally understood to mean . . . designed or configured to *accomplish the specified objective*, not simply that they can be made to serve that purpose." *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) (emphasis added). Thus, Meyer's opinion is not based on an erroneous construction of the phrase "configured to."

Plaintiff also argues that Meyer impermissibly speculates that Defendants' Bin Gator's return area floor is not "specially designed" to support the weight of the paddles, but rather is designed to prevent the escape of residual grain. [411] at 11–

---

[2] Claim 1 contains the following limitation: "at least one of the at least two units comprising a drive unit configured to carry a portion of the succession of interconnected paddles and move the sweep assembly with respect to a surface of the bin below the sweep assembly . . . at least one of the at least two units comprising a pivot unit configured to carry a portion of the succession of interconnected paddles. . . ." [395] at 15–16.

10

12. On this point, the Court agrees that Meyer may not offer impermissible speculation about any individual's specific intent in designing the return area floor. Fed. R. Evid. 602. Meyer may, however, offer an opinion consistent with the Federal Circuit's opinion in *Aspex*. That is, he is free to opine, based on his knowledge and expertise, that the return area floor does not accomplish the specific objective of carrying the weight of the paddles. 672 F.3d at 1349. For instance, Meyer opines in his report that the Bin Gator sweep "does not require that the weight of the paddle be supported . . . as its chain orbits in a horizontal plane: any chain sag will simply result in the paddles dragging across any surface beneath," and that this chain sag "is not problematic." [411-1] at 14. This opinion does not impermissibly speculate about the inventor's intent and remains relevant to the question of whether a feature of the Bin Gator sweep was made "to accomplish the specified objective" of carrying the weight of the paddles. *Aspex*, 672 F.3d at 1349.

Plaintiff additionally argues that, in opining that the Accused Products are not "configured to" support the weight of the paddles, Meyer does not compare the features of the Accused Products to the limitations in claim 1 but rather compares claim 1 to a patent Defendants own that covers the Accused Products. [411] at 12. It is true, as Plaintiff argues, that a literal infringement analysis should compare the claims of the relevant Patent to the features of the Accused Products because literal infringement "exists when every limitation recited in the claim is found in the accused device." *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1341 (Fed. Cir. 2016). Here, Meyer *does* describe the features of the Accused Products. He explains

in detail his opinion that the Accused Products lack a pivot unit or drive unit configured to carry a portion of the succession of interconnected paddles. He does reference a patent for Prairie Land's sweep, [411-1] at 13, but only as evidence to buttress his opinion that the Bin Gator sweep's return area is not configured to support the weight of the paddles.

This Court is also unpersuaded by Plaintiff's argument that Meyer applied an erroneous legal standard to support his opinions regarding the doctrine of equivalents. *Contra* [411] at 13–14. In his report, Meyer opines "there is no Doctrine of Equivalents infringement because the return floor doesn't perform substantially the same function in substantially the same way to obtain *the same result*." [411-1] at 15 (emphasis added). Plaintiff argues that Meyer's opinion employs a stricter standard than that allowed by the law and that infringement can be found if the accused products obtain *substantially the same*, not *the same*, result. *Id.* Plaintiff's argument highlights an inconsistency in Federal Circuit case law: some cases suggest that Plaintiff's "substantially the same" standard applies to function, way, *and* result, while others appear to require that the result be the "same." *Compare, e.g.*, *Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*, 998 F.3d 917, 924 n.1 (Fed. Cir. 2021) (noting the "doctrine of equivalents analysis requires only that" the accused products perform "*substantially* the same" in function, way, *and* result) *with Ajinomoto Co. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1356 (Fed. Cir. 2019) (explaining that a product can infringe under the doctrine of equivalents "if it performs substantially the same function in substantially the same way to obtain the *same result*.") (quoting *Duncan*

12

*Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1362 (Fed. Cir. 2019)). This Court cannot say that Meyer applies the wrong standard. To the contrary, he applies one of the standards—the stricter one—found in the Federal Circuit's jurisprudence.

## C. Damages Opinions

Plaintiff argues that Meyer employs an incorrect legal standard in rendering opinions on reasonable royalty damages, specifically, with regard to the "smallest salable patent practicing unit" principle. A patent owner can sue for reasonable royalties that it would have received from the defendant's use of the patented features; these damages compensate the patentee for "its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *360Heros, Inc. v. Gopro, Inc.*, No. CV 17-1302-MFK-CJB, 2022 WL 1746854, at *9 (D. Del. May 31, 2022) (quoting *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015)). As part of the reasonable royalty analysis, the smallest salable patent practicing unit (SSPPU) principle recognizes that "in any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the [SSPPU], without showing that the demand for the entire product is attributable to the patented feature." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1310–11 (Fed. Cir. 2018) (quoting *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67–68 (Fed. Cir. 2012)); *see Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (instructing that in calculating royalties "the royalty base

should not be larger than the smallest salable unit embodying the patented invention").

> Meyer offers the following opinion about the SSPPU:
>
> The Sioux Steel sweeps are manufactured, shipped, and delivered in modules. One or more of the modules may include a pivot structure or pivot unit covered by the '937 Patent. The Sioux Steel sweeps can be assembled with or without the module(s) containing a pivot structure or pivot unit. As evidenced by Sioux Steel's deposition testimony, Sioux Steel sells its paddle sweep without a pivot section or pivot structure in smaller diameter bins. Sioux Steel could simply lengthen these shorter sweeps through addition of additional modules not having pivot units or pivot structures. In my opinion, *the smallest saleable patent practicing unit is the pivot unit or any module with a pivot structure.*

[411-1] at 16–17 (emphasis added).

Plaintiff argues that Meyer uses the wrong legal standard for determining the SSPPU. Plaintiff focuses on Meyer's deposition testimony that the pivot unit is the SSPPU because if it were taken out of Defendants' Accused Products, the products would not then infringe the Patent. [411-2] at 26 ("Q. What does 'Smallest Saleable Patent Practicing Unit' mean to you? A. It is the unit that, if it were not included, would cause there not to be infringement."). Plaintiff argues that this testimony expresses an erroneous legal standard because identifying the SSPPU requires examining whether the Patent's claim covers the Accused Product as a whole. [411] at 15. But Meyer did not express an erroneous legal standard. Meyer's testimony correctly reflects the principle that "the value to be measured is only the value of the infringing features of an accused product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

14

Although somewhat difficult to understand, Plaintiff's complaint with Meyer's opinion appears to boil down to Plaintiff's disagreement with Meyer's use of SSPPU to calculate royalties. Indeed, instead of adopting the SSPPU method of calculating royalties, Plaintiff ostensibly relies on the "entire market value" methodology; this methodology avoids the need for apportionment between patented and unpatented features of a product if the patentee demonstrates "that the patented feature creates the basis for customer demand or substantially create[s] the value of the component parts." *Shire Viropharma Inc. v. CSL Behring LLC*, No. CV 17-414, 2021 WL 1227097, at *23 (D. Del. Mar. 31, 2021) (alteration in original) (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)); *see* [411] at 15 (arguing that claim 1 of the Patent covers the whole of the Accused Products, not just the pivot unit component). This "entire market value" rule is a "narrow exception" to the general rule that royalties must be based on the SSPPU. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). But Plaintiff's use of a different methodology than Meyer in calculating royalty damages does not make Meyer's methodology unreliable; rather, the differences present a conflict in credibility that is more appropriately submitted to the jury. *See MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11-CV-5341 YGR, 2014 WL 2854890, at *4 (N.D. Cal. June 20, 2014) (declining to exclude an expert who assessed damages based on the entire market of the defendant's accused chips, rather than apportioning damages based on the patent-practicing components on the accused chips, because issues with

15

the expert's conclusions and factual underpinnings "bear on the weight to be accorded the testimony" and not its reliability or probative value).

Relatedly, Plaintiff contends that Meyer offers a legally erroneous opinion that the pivot unit of the patented technology does not form the basis for the "demand" of either Plaintiff's products or the Accused Products. [411] at 15. According to Plaintiff, under a lost profits analysis, the concept of "demand" does not consider the demand for a particular unit within the product but rather the product as a whole. *Id.* Yet as Defendants explain in their response brief, Meyer's opinion on this point is not directed at a lost profits analysis; instead, it is directed as a rebuttal to Plaintiff's expert, Jeffrey Decker's, opinion that the pivot unit is a "key element" to the success of Plaintiff's products. [438] at 13. This opinion is relevant to rebut Decker's and Plaintiff's position that the entire market value methodology should apply to the royalty damages calculations. Therefore, this Court will not exclude Meyer's opinion.

For the reasons explained above, this Court **DENIES** Plaintiff's motion to exclude Bruce Meyer [409].

### III.    Krista F. Holt

Defendants move to exclude Plaintiff's damages expert, Krista F. Holt. [418]. Holt is a managing director at Econ One Research, Inc, a national research and consulting firm. [419-2] at 6. She holds a bachelor's degree from Wake Forest University and an MBA from the University of Louisville. *Id.* at 7. Holt is a Certified Licensing Professional (CLP), lecturer on intellectual property topics, and has worked many years in accounting and market management for private sector companies. *Id.*

16

at 6–7. Holt provides an opinion regarding the "measurement of damages arising from the acts of patent infringement" alleged in this case. *Id.* at 7. Defendants move to exclude Holt on multiple grounds.

### A. Qualifications

Initially, the Court rejects Defendants' attempt to exclude Holt based on her qualifications. Defendants move to exclude Holt arguing that she is a psychology major, is not an accountant or CPA, did not conduct surveys for this case, and has never seen a grain sweep in person. [420] at 6. The facts that Holt lacks specialized experience in grain sweeps and did not conduct surveys for this case is not a bar to her testimony. She is a damages expert only and will not be offering any opinions on infringement. Indeed, her damages opinions are based on the assumption that the Court has already made the "predicate findings" of liability. [419-2] at 7. Moreover, despite not being an accountant or CPA, Holt worked for eleven years in accounting and market management and served in the most senior financial position (comptroller) for two companies. *Id.* at 6. She possesses the "knowledge, skill, [and experience] required to testify under Rule 702. Any issues Defendants have with Holt's educational background or lack of CPA status is more "properly explored on cross-examination." *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, 858 F. Supp. 2d 505, 512 (D. Md. 2012) (denying motion to disqualify valuation expert).

### B. Plaintiff's and Defendants' Financial Information

Next, Defendants take issue with Holt's data and factual assumptions underlying her calculations regarding Plaintiff's and Defendants' financial information in calculating damages. [420] at 6–9. Defendants complain, for instance, that Holt did not consider Plaintiff's general ledger, used her own pro-rata calculations on Prairie Land's 2016 revenue instead of running a revenue report from its general ledger to determine revenue, and did not consider Prairie Land's externally compiled financial statements. *Id.* But to "the extent [an expert]'s credibility, data, or factual assumptions have flaws, these flaws go to the weight of the evidence, not to its admissibility." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1299 (Fed. Cir. 2015). The "proper way" to challenge an expert's reliance on certain data, or her non-reliance on other data, "is through cross-examination of the expert." *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1148 (N.D. Cal. 2003), *aff'd*, 471 F.3d 1293 (Fed. Cir. 2006); *see also, e.g.*, *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013) (noting an expert's decision of which "variables to include in a regression analysis is normally a question that goes to the probative weight of the analysis rather than to its admissibility").

### C. Royalty Calculation

Defendants argue that Holt's royalty calculation is methodologically unsound. A reasonable royalty theory of damages "seeks to compensate the patentee not for lost sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been

barred from infringing." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015). There are several ways to establish a reasonable royalty; here, Holt has elected to opine on the hypothetical negotiation theory of damages. The hypothetical negotiation approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (hereinafter "*Georgia-Pacific*")). In determining a reasonable royalty rate, courts are guided by fifteen factors contained in *Georgia-Pacific*. *Probatter Sports, LLC v. Sports Tutor, Inc.*, 586 F. Supp. 3d 80, 88 (D. Conn. 2022) (citing *ResQNet.com, Inv. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)).

In attacking her damages opinions, Defendants first argue that Holt commits the same errors for which another district court excluded her in an unrelated patent case. In *Open Text S.A. v. Box, Inc.*, the court excluded Holt's damage opinion based on the *Georgia-Pacific* factors because Holt failed to explain "the link, if any, between" the considerations Holt took in reaching a final royalty amount. No. 13-CV-04910-JD, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015). Indeed, as the court explained, rather "than spelling out the steps she took to go from the data to the royalty rate opinion, Holt cites her 'experience'—an abstraction not visible to the eyes of the Court, the jury, and opposing counsel, or testable in the crucible of cross-examination." *Id.* The Court cannot find that Holt commits the same errors in this report. Here, Holt evaluates each of the fifteen *Georgia-Pacific* factors and explains

how each factor results in an upward, downward, or neutral impact on her royalty calculation. [419-2] at 65–87. The Court has reviewed Holt's discussion and believes that, unlike in *Open Text*, she explains how each factor impacts the royalty analysis and thus makes it testable for the purposes of cross-examination.

Defendants also contend that Holt commits various errors in determining reasonable royalties. This Court finds that none of these alleged errors warrant exclusion of Holt's testimony. For example, Defendants argue that Holt failed to "isolate the value of the patent" when calculating damages, [420] at 11–12, but this argument rests on a fundamental disagreement between the parties—whether the royalty calculation should be based upon the entire sweep, or alternatively, a smaller component like the pivot unit. This disagreement does not make Holt's opinion unreliable; it merely creates a jury question of how to apportion damages. Defendants also criticizes Holt's royalty rate analysis by reference to licensing agreement that Plaintiff executed with an unrelated party for a bin sweep. *See* [420] at 12–13. Again, however, Defendants' criticisms amount to disagreements with how Holt interpreted the data points in the licensing agreement and with other facts that Holt supposedly ignored. Those criticisms can be explored on cross-examination. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) ("Microsoft's quarrel with the facts Wagner used go to the weight, not admissibility, of his opinion."), *aff'd*, 564 U.S. 91 (2011).

Equally unconvincing is Defendants' attempt to exclude Holt's analysis of the *Georgia-Pacific* factors. Defendants argue that Holt merely makes statements on

whether each factor impacts the royalty rate in an upward, downward, or neutral direction without attempting to quantify the effect of each *Georgia-Pacific* factor. [430] at 13–17. Yet the law does not require Holt to make quantitative assessments of each factor. Indeed, "many of the *Georgia-Pacific* factors are qualitative, not quantitative," and therefore experts may supplement quantitative evidence with the expert's own experience and judgment." *Plastic Omnium Adv. Innovation & Rsch. v. Donghee Am., Inc.*, 387 F. Supp. 3d 404, 414 (D. Del. 2018) (internal quotation omitted), *aff'd*, 943 F.3d 929 (Fed. Cir. 2019). Holt's qualitative assessments of the *Georgia-Pacific* factors constitute an "acceptable methodology," and any disagreements with Holt's analysis should be addressed by "proper cross-examination and/or presentation of competing evidence." *Id.*

Defendants next argue that Holt commits other methodological flaws in coming to her reasonable royalty conclusions, namely: (1) she considers evidence outside the relevant time period for her hypothetical negotiation analysis; and (2) she fails to reliably apportion the royalty base to the SSPPU. [430] at 17–19. These arguments fare no better because, at bottom, they are complaints with the data Holt did or did not use. *See id.* at 18 (arguing that Holt "ignores key data relating to the value of the patented feature), 17 (arguing that Holt "improperly considers" certain evidence). Quibbles with Holt's data can, again, be addressed through cross-examination and presentation of competing evidence.

### D. Lost Profits Calculations

Finally, Defendants' arguments to exclude Holt's lost profits damages analysis are rejected. Like their arguments concerning reasonable royalties, Defendants' arguments boil down to disagreements with the facts Holt used in coming to her opinions. Defendants argue that Holt's opinions regarding lost profits are based solely on interviews of Plaintiff's personnel and expert, Jeffrey Decker; that she did not rely on experiences from customers in determining the availability of non-infringing alternatives; and relies on inconsistent and unreliable financial information to establish the amount of profit Plaintiff would have made in the but-for damages analysis. [420] at 21–27. At their core, these arguments are disagreements "with the conclusions reached by" Holt "and the factual assumptions and considerations underlying those conclusions, not [her] methodology." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012). These disagreements again go to the weight of Holt's testimony and do not warrant its exclusion.

For the foregoing reasons, this Court denies Defendants' motion to exclude Holt.

## IV.   Paul Rodrigues

Plaintiff moves to exclude Paul Rodrigues, Defendants' damages expert. [412]. Rorigues is a certified public accountant, a certified fraud examiner, certified in financial forensics, and obtained a masters degree in taxation. [417-1] at 7.

### A.   Qualifications

Initially, this Court rejects Plaintiff's motion to exclude Rodrigues on the basis of his qualifications. Plaintiff argues that Rodrigues lacks experience serving as an

expert in the patent context, [417] at 3, 8, but Rodrigues is offered as a damage expert. As a CPA and economics expert, Rodrigues has the scientific, technical, or other specialized knowledge needed to assist the trier of fact determine damages. Fed. R. Evid. 702(a). Moreover, despite Rodrigues' lack of patent experience, in coming to his opinions, he is entitled to rely on the opinions of Bruce Meyer, Defendants' technical expert, for background. *DataQuill Ltd. v. High Tech Computer Corp.*, 887 F. Supp. 2d 999, 1026 (S.D. Cal. 2011) ("It is routine and proper for a damages expert in technical patent case to rely on a technical expert for background."). Thus, while Rodrigues will not be allowed to offer his own opinions on the technical aspects of infringement, he may rely on facts and assumptions obtained from Meyer's opinion in coming to his own conclusions about damages.

### B. Reliability

Plaintiff also challenges the reliability of Rodrigues' opinions. But none of Plaintiff's challenges warrant Rodrigues' exclusion. Plaintiff focuses on various weaknesses in Rodrigues' analysis of two license agreements to determine a reasonable royalty rate. [417] at 10–11. Specifically, Plaintiff argues that Rodrigues, unlike Holt, failed to account for "differentiating circumstances" between the license agreements and the facts of this case, which resulted in Rodrigues' arrival at an erroneous royalty rate. [417] at 11. But the "degree of comparability of. . . license agreements as well as any failure on the part of [an] expert to control for certain variables are factual issues best addressed by cross examination and not by

exclusion." *Active Video Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).

Plaintiff also criticizes Rodrigues' analysis for basing damages on only "one component of the patented invention" rather than the whole. [417] at 11–14. This again goes to the parties' fundamental disagreement with how to apportion damages. Plaintiff believes the claimed invention comprises an entire "modular bin sweep system of which the pivot unit is only one component." [417] at 13; Defendants, in contrast, base their damages calculations upon a smaller unit within the sweep. *See* [446] at 10–14. The parties' dispute regarding the experts' competing apportionment analyses is more properly submitted to the jury. *See, e.g.*, *Albritton v. Acclarent, Inc.*, No. 3:16-CV-03340-M, 2020 WL 11627275, at *19 (N.D. Tex. Feb. 28, 2020) ("Defendant's expert has provided a competing apportionment analysis, and the jury can decide at trial which, if either, is correct."); *Shire Viropharma Inc. v. CSL Behring LLC*, No. CV 17-414, 2021 WL 1227097, at *28 (D. Del. Mar. 31, 2021) ("Defendants will be free to cross-examine Dr. Bell on his factual assumptions underlying his reasonable royalty opinion. To the extent Defendants can establish at trial that Dr. Bell improperly applies the entire market value rule and fails to apportion between patented and non-patented components of Haegarda, Dr. Bell's testimony may be deemed an insufficient basis on which to support a damages award.").

Plaintiff's remaining arguments also lack merit. Plaintiff critiques Rodrigues' rebuttal to Holt's opinions, arguing that he relied on inaccurate data and failed to consider certain facts. [417] at 14. Plaintiff also disputes the accuracy of Rodrigues'

opinions on non-infringing alternatives, specifically, his "misunderstandings" about what constitutes an acceptable alternative to customers and the temporal scope of his consideration of those alternatives. *Id* at 14. Plaintiff additionally faults Rodrigues' sole use of Defendants' financial information, rather than other pertinent data, in calculating lost profits. *Id.* at 14–15. Finally, Plaintiff argues about weaknesses in Rodrigues' opinions concerning customer demand and interchangeability of the two sides' products. [417] at 15–16. Again, these are disagreements with Rodrigues' use of underlying facts and assumptions, not his methodology, and do not warrant his exclusion. *ActiveVideo*, 694 F.3d at 1333.

For these reasons, this Court denies Plaintiff's motion to exclude Rodrigues.

## CONCLUSION

For the reasons stated above, this Court denies Plaintiff's motion to exclude Bruce Meyer [409], denies Plaintiff's motion to exclude Paul Rodrigues [412], denies Defendants' motion to exclude Krista Holt [418], and denies Defendants' motion to exclude Jeffrey Decker [414].

E N T E R:

Dated: November 23, 2022

_____
MARY M. ROWLAND
United States District Judge